**NATIONAL JEWISH ADVOCACY CENTER, INC.**
Matthew Mainen
Mark Goldfeder
*Practicing Pro Hac Vice*
3 Times Square, Suite 517
New York, NY 10036
Phone: (301) 814-9007
Email: Mark@njaclaw.org

**CARTER ARNETT PLLC**
Omer Salik
111 Pier Ave., Suite 101
Hermosa Beach, CA 90254
Phone: (214) 550-8188
Email: osalik@carterarnett.com

**IN EVERY GENERATION**
A division of Hershenson Rosenberg-Wohl, APC
David M. Rosenberg-Wohl (SBN 132924)
3080 Washington Street
San Francisco, CA 94115
Phone: (415) 317-7756
Email: david@hrw-law.com
Counsel for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

|  |  |
|---|---|
| **ELI SCHECHTER and TALYA MALKA, individually and on behalf of a class of similarly situated individuals**<br><br>*Plaintiffs,*<br><br>v.<br><br>**CHAPMAN UNIVERSITY, THE BOARD OF TRUSTEES OF CHAPMAN UNIVERSITY, and DOES 1-50**<br><br>*Defendants.* | **Case No. 25-2426**<br><br>**[Class Action]**<br><br>**Jury Trial Demand**<br><br>**FIRST AMENDED COMPLAINT** |

## FIRST AMENDED COMPLAINT – CLASS ACTION

Plaintiffs and proposed Class Representatives Eli Schechter and Talya Malka, on behalf of themselves and similarly situated individuals, by and through undersigned counsel, hereby file this First Amended Complaint as a matter of course pursuant to F.R.C.P. 15(a)(1)(B), against Defendants Chapman University, The Board of Trustees of Chapman University (collectively "Chapman"), and Does 1-50 for violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000a; the Civil Rights Act of 1866, 42 U.S.C. § 1981; and Cal. Educ. Code § 220; to recover monetary damages, attorneys' fees, costs and obtain injunctive.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 as the action arises under, *inter alia*, 42 U.S.C. § 2000a and 42 U.S.C. § 1981, laws of the United States, and all other claims are part of the same case or controversy pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, and Defendants have conducted business in this judicial district and may be found conducting business in this judicial district.

## PARTIES

3. Plaintiff and proposed class representative Eli Schechter is a 2024 graduate of Chapman University who was discriminated against by Defendants on grounds of his Jewish religion, race, and national origin. As a Chapman alumnus, he is entitled to visit campus. He was president of Chapman's chapter of Students Supporting Israel ("SSI") for the 2023-2024 school year.

4. Plaintiff and proposed class representative Talya Malka is a 2024 graduate of Chapman University who was discriminated against by Defendants on grounds of her Jewish religion, race, and national origin. She is an Israeli-American. As a Chapman alumnus, she is entitled to visit campus.

5.      Defendant Chapman University is a private, non-profit university located in Orange, California. It is a recipient of federal financial assistance.

6.      Defendant The Board of Trustees of Chapman University oversees, manages, and defends the actions against Chapman. The Board is liable for the unlawful actions of Chapman.

7.      Does 1-50 are presently unknown but are believed to have acted in coordination with Chapman or otherwise incited Chapman to partake in the illegal acts described herein.

### FACTUAL ALLEGATIONS

**Plaintiffs' Prior and Sustained Ties to Chapman University**

8.      As a condition of Plaintiffs' accepting admission to and enrolling in Chapman, Plaintiffs signed a number of documents outlining in detail a contractual relationship with the university, including but not limited to a "Tuition and Fee Master Payment Contract." In short, in consideration of Plaintiffs' timely payment of tuition and adherence to a number of academic and conduct policies, Chapman bound itself to providing Plaintiffs with a university education and services on and off campus. The details of this contractual relationship were spelled out in a student handbook and/or other document(s) containing relevantly identical information to that found in the student handbook.

9.      Plaintiffs graduated from Chapman in 2024 but have returned since and will continue to return for the indefinite future. Malka has been on campus multiple times since graduating as she lives less than an hour away. She was most recently on campus on January 19, 2026, where she had coffee with a spiritual advisor, Chabad Rabbi Eliezer Gurary, walked around campus, and visited multiple buildings including Beckman Hall, the Argyros School of Business and Economics, and Argyros Forum. Malka has many friends still at Chapman from her sorority and saw several of them on this visit. She looks forward to seeing them on campus again. In addition to regularly visiting campus for aforestated purposes, she will attend the Business School's 2026 May graduation. Schechter returned to campus on

January 19, 2025, and intends to return at least once a year in his capacity as an alumni advisor to SSI, with whom he is organizing an on-campus speakers event that will include him and will occur no later than the end of this year.

10.    Chapman welcomes alumni on campus, and being a Chapman alumnus is an incident and benefit of having previously entered into a contract with Chapman to receive educational services and fulfilling the contractually mandated graduation requirements.

**Plaintiffs' Religion, Race, and National Origin as Related to Israel**

11.    Plaintiffs are Jewish Americans and Zionists, in that their identities include a deeply rooted connection to the land of Israel, their ancestral homeland as Jews. Both of Malka's parents were born in Israel, and while Schechter and his family have lived outside of Israel for countless generations, he identifies Israel as his ultimate place of national origin. Plaintiffs racial and religious identities as Jews are also intimately connected to Israel.

12.    Zionism can be broadly defined as "the national movement for the return of the Jewish people to their homeland and the resumption of Jewish sovereignty in the Land of Israel. Since the establishment of the State of Israel in 1948, Zionism has come to include the movement for the development of the State of Israel and the protection of the Jewish nation in Israel through support for the Israel Defense Forces."[1] While the term "Zionism" and its most recent iteration trace back to the late 1800s, the foundations of Zionism go back thousands of years and, in fact, emerged alongside the Jewish people. Much like those who coined and popularized the term, Plaintiffs' Zionism is ancient and integral to their Jewish race, religion, and national origin. No other term adequately encapsulates Plaintiffs' indelible connection to Israel as Jews.

---

[1] https://www.jewishvirtuallibrary.org/a-definition-of-zionism

13.     Plaintiffs' Zionism and connection to Israel are neither idiosyncratic nor can it be chalked up to mere politics; it is at the core of what makes Plaintiffs (and millions of others) Jewish. The Bible itself references this ancient Jewish hope[2] for return to the Jewish sovereign homeland while the Prophets and Writings of the Hebrew Bible repeatedly record this aspiration.[3] From a Jewish law perspective, over half of the Biblical commandments that religious Jewish people are bound to obey are specifically tied to the Jewish homeland.[4] From a doctrinal point of view, belief in and hope for the return to Israel is literally part of the 13 Principles of Jewish Faith.[5]

14.     Indeed, the Jewish religion is predicated on the belief that God promised Abraham that he and his descendants shall live in and maintain sovereignty over the land of Israel,[6] and much of the narrative portions of the Torah and greater Jewish Bible, or Tanakh, detail the tribulations Jews experience when they do not have sovereignty over this land and their resulting struggle to achieve and maintain such sovereignty.

15.     The above-mentioned doctrinal aspects of Judaism are core to Plaintiffs' sincerely held religious beliefs. Even from a purely secular perspective, this connection to Israel is a core feature of the cultural identity of those of Jewish national origin and race like Plaintiffs.

16.     One could make the argument that Zionism is the most ubiquitous trait in American Jewry.  82% of "U.S. Jews say caring about Israel is an important or essential part of what being Jewish means to them," 58% are "emotionally attached to Israel," and 32% believe "God gave the land that is now Israel

---

[2] *See e.g., Deuteronomy* 30:1-5.

[3] *See e.g., Isaiah* 11:11-12; *Jeremiah* 29:14; 20:41-42; *Psalm* 126; *Psalm* 137.

[4] *About Us,* TORAH VEHA'ARETZ INSTITUTE, https://en.toraland.org.il/about/.

[5] *Maimonides Introduction to Perek Helek,* MAIMONIDES HERITAGE CENTER, https://www.mhcny.org/qt/1005.pdf. (explaining the 12th Fundamental Principle).

[6] Genesis 12:1-9.

to the Jewish people."[7] In comparison only 17% keep kosher at home[8] and "[o]n a typical day," 20% "wear something that is distinctively Jewish, such as a kippa (yarmulke)."[9]

17.     Whether one views Plaintiffs' Judaism through the prism of religion, race, or national origin—Jewish sovereignty and self-determination in the land of Israel, presently embodied in the State of Israel, is core to all three identities.

**Chapman's Post October 7 Discrimination against Jewish Students**

18.     Following October 7, the worst massacre of Jews since the Holocaust, Jewish students at Chapman University were subjected to a campaign of harassment by Students for Justice in Palestine ("SJP") lasting for the entire duration of the 2023-2024 school year and beyond. This campaign of harassment was coupled with discrete acts of discrimination against Jewish students, enacted with Chapman's direct approval. Throughout the school year, Schechter remained in frequent contact with Chapman's Dean of Students Jerry Price and then-President Daniele Struppa. His emails to them all accurately recount antisemitic events that he witnessed or experienced and provide a paper trail showing that Chapman's leadership was kept apprised throughout the year of antisemitic harassment and discrimination on campus but failed to adequately respond by, *inter alia*, disciplining SJP as well as students associated with the hate group. In fact, at all times relevant hereto, Chapman's administrators knew about the harassment and discrimination but permitted it despite Schechter's near daily pleas on behalf of Chapman's Jewish community for respite.

19.     Almost immediately after the October 7 massacre, Jewish students and their respective organizations erected a memorial to the victims, and thereafter Chapman SJP members openly and

---

[7] https://www.pewresearch.org/religion/2021/05/11/u-s-jews-connections-with-and-attitudes-toward-israel/

[8] https://www.pewresearch.org/religion/2021/05/11/jewish-practices-and-customs/

[9] https://www.pewresearch.org/religion/wp-content/uploads/sites/7/2021/04/PF_05.11.21.Jewish_Survey_Topline.pdf at 35.

publicly desecrated the memorial by stealing and removing flags. SJP did not desecrate displays erected by non-Jewish student groups, and for the duration of the school year SJP targeted only Jewish student organizations.

20.     On October 9, 2023, SJP member Ismail Khader posted an Instagram story of a large Palestinian flag hanging above a group of small Israeli flags at the memorial in an act of ethnic intimidation and domination. He also posted on Instagram a story of him ripping the Israeli flags out of the ground. The original video was captured by a Jewish student and Khader reposted it, sending an implicit message of "I did what I did, and I know I will get away with it." Khader was correct, and he was not the only one to rip out flags. One-time SJP President Hakim Hassan participated in the desecration of the memorial.

21.     The Israeli flag is blue and white—symbolizing the distinctive design of Jewish prayer shawls— and is emblazoned with a large Jewish Star of David, both exclusively associated with the Jewish people in common practice. Courts have recognized that the Israeli flag represents Jewish heritage. *See, e.g.*, *Sumrall v. Ali*, 793 F. Supp. 3d 199, 201 (D.D.C. 2025) ("Sumrall proudly displayed her Jewish heritage at a protest by tying an Israeli flag around her neck.").

22.     The same day as Khader's desecration of the Israeli flag, Schechter emailed Dean of Students Jerry Price about the incident, and the broader desecration, requesting intervention. He noted "individuals are tampering with, changing and removing flags from our ceremonial site. I hope Chapman will protect us and our ceremonial site. A lot of Jews in our community are scared and have reported individuals ripping Israeli flags from the ground and giving them mean looks." Schechter also later noted "I have a responsibility to share our students' sadness and disappointment at the Palestinian flag that was just hung above our flag, the Israeli flags tampered with and thrown away on campus." Schechter requested intervention. Throughout these early exchanges, Schechter emphasized that he did not see the situation as political but rather a show of solidarity with the victims in Israel. In other words, Jewish students like

Schechter were expressing their race, religion, and national origin as inseparably connected to Israel, its people, and the existential threats they were defending against, and Schechter put the university on full notice of the apolitical Jewish connection to Israel.

23.    On or about October 9, Khader yelled "Fuck Jews" to a group of Jewish students mourning October 7. Chapman student Edan Gal relayed this to Dean Price, expressing concern. Schechter was CC'ed in this communication. Rather than indicating any plans to meaningfully discipline Khader, Price moved forward with attempting to arrange a meeting between him and Jewish students, including Schechter. This is despite the fact that Gal apprised Price of abundant evidence of Khader's underlying animus towards Jews, including liking posts on social media saying things like "after the Nazi's y'all would be humble and kind to your neighbors." Gal noted "I personally don't feel someone like that is capable of having a productive conversation, since his hatred for Jews is so obvious and abhorrent." In fact, Khader was ultimately rewarded for his antisemitic tirades and vandalism with a free lunch, paid for by Price, that was also attended by Schechter.

24.    After much discussion, Schechter and Dean Price made arrangements to meet with Khader. In the early stages of planning this meeting, Schechter noted "I'd very much like to build a bridge between our communities. It's very important to me that Jewish students and Palestinian students feel safe when they attend campus. In an ideal world, we're all friends." When the meeting was ultimately held, at no point did Price indicate Khader would be disciplined for shouting "Fuck Jews" to a group of Jewish students on campus.

25.    On October 17, Schechter and other Jewish students held an on-campus memorial for the October 7 victims. In discussing the memorial and the memorial grounds, Price noted concern that the presence of Israel Defense Forces ("IDF") flags might take away from the idea that civilians were being mourned. Schechter apprised Price of the fact that "The [IDF] is the only thing preventing the next holocaust and

IDF soldiers died while fighting the terrorists who were actively going house to house killing civilians." Nonetheless, in an act of conciliation he later noted: "if Ismael expresses during our lunch on Thursday that it would help our joint mission to bring our communities together if I removed the IDF flag from the memorial then I will take the IDF flags down on Thursday."

26.     Also on October 17, in an act of intimidation against both the university and Jewish students, SJP posted on Instagram a photo of Price standing with a student engaged in Jewish ritual with a sign saying "I did a mitzvah for Israel" juxtaposed against apparent civilian casualties in the Gaza War. SJP wrote "this is what Jerry Price supports." By connecting Jewish ritual to purported casualties in Gaza, SJP was playing on historic blood libel attacks against Jews. The photo of Price and the Jewish student long predated October 7 and the emerging concerns that Price and the greater Chapman administration were permitting an atmosphere of antisemitism. SJP dug deep to find that photo.

27.     On October 18, Price expressed deeper concerns with the presence of IDF flags on the memorial grounds, noting: "I believe the presence of the IDF flag has become a point of contention. I know you wanted to discuss the matter with Ismail and then decide, and I will 100% support your decision to adhere to this plan. On the other hand, I also believe there is mounting evidence that the flag is both upsetting Palestinian students and taking focus away from the Israeli victims being honored; as a result, I think there also is a rationale for determining the IDF flag should be removed sooner." Schechter replied by noting, *inter alia*, "I want to build rapport with Ismael and his community . . . I would like to show how we listened to them when they expressed dismay for aspects of our memorial." Thereafter, Schechter ultimately decided to remove the IDF flags as a gesture of good faith. SJP, however, never returned this good faith and only amplified what would become a school year-long campaign of harassment and discrimination directed solely at Jewish students and their organizations.

28.     On October 20, 2023, Price and Schechter exchanged emails on whether anti-Israel flyers would be permitted on light poles in the midst of the Jewish students' October 7 memorial. Price concluded that the light pole in the center of the memorial would be off limits to anti-Israel messaging but other light poles in the midst of the memorial would be fair game, provided the flyers complied with basic rules like noting which student organization sponsored the flyer.

29.     As discussed below, when SJP commandeered a portion of campus with the university's full acquiescence, pro-Israel students and by implication messaging and flyers were banned from that portion of campus—a rule of which the University was aware but did not challenge—thus exhibiting a double standard whereby the antisemitic SJP could post flyers in the midst of a memorial for Jewish victims but Jews could not post in an SJP space.

30.     On or about October 23, 2023, Chapman student and SJP board member Madison Vivona stole a number of Israeli flags from the memorial, filmed herself doing so, and filmed herself ripping down posters of the hostages. Vivona posted her acts of vandalism on social media.[10] Schechter reminded Stephen Heggem, Program Coordinator in Dean Price's Office, of this on November 7, 2023. Vivona was disciplined less harshly than the discipline routinely meted out for similar conduct against other minority groups. On that same day, in an act of ethnic intimidation, Schechter found a sign originally saying "my heart is with Israel" defaced with the placement of a Palestinian flag over the word "Israel." Schechter also found a number of flyers posted by Jewish student groups ripped down and replaced with anti-Israel flyers affiliated with SJP. Flyers posted by organizations unaffiliated with Judaism remained in the midst of the SJP flyers, indicating SJP targeted only flyers belonging to Jewish organizations. As would become clear over the school year, SJP was engaged in an organized campaign of ripping down

---

[10]  https://www.instagram.com/reel/CyzvdeqOCy0/

Jewish students' flyers, and only their flyers, and colonizing the space they once filled with their own anti-Israel flyers, a systemic pattern of ethnic and racial intimidation.

31.     On October 26, 2023, Malka initiated contact with Price, expressing her dismay that he was unwilling to publicly identify Hamas as a terrorist organization. Malka also pointed to Madison Vivona's vandalism and Price's encouragement for Jewish students to remove the IDF flags from the October 7 memorial.

32.     On October 28, 2023, Schechter emailed Price, indicating his desire to attend events hosted by SJP. Schechter noted "I will peaceful[ly] go, observe and learn more about their perspective without any attempt to debate them. Actually, I think it will surprise me on how much [we] see eye to eye." Schechter further noted "I'm fully aware of my right to attend their club and my right to be treated no different because of my Judaism." Finally, he indicated "I may be known for my efforts to foster peace since I successfully lobbied on behalf of SJP to remove the IDF flags on campus and met with [Khader] to serve as a point of contact for the Jewish community." Thus, Schechter wanted to attend SJP events to see if bridges could be built as he had a history of building bridges.

33.     Thereafter, Schechter and a group of Jewish students (Malka, Merlot Tunnell, Max Wiseman, Jonathan Tako, and Jackson Feldman), a non-Jewish student with a Jewish sounding last name (Colby Abeles[11]), and a non-Jewish student with a non-Jewish sounding last name (Kate Gough) RSVP'ed for an October 30, 2023 SJP "teach-in" event on Chapman's campus. Only Kate Gough was issued an invitation.

34.     On October 30, Schechter emailed SJP to advise he did not receive an invite. In fact, the only student to receive an invite from Schechter's group was Kate Gough, the only student of the group who was neither Jewish nor had a Jewish sounding last name. Schechter thereafter reported to Price SJP's

---

[11] https://www.familysearch.org/en/surname?surname=abeles

discriminating against students on the basis of nothing more than having a Jewish sounding last name. Price responded that "it is reasonable for SJP-Chapman to limit its membership to students who support its mission . . . I have been provided the names of three Jewish students who have been extended invitations to tonight's teach-in . . . SJP-Chapman did confirm that there were some RSVP requests that were denied because they concluded that the individuals did not share the objectives of the event . . . I frankly cannot condone your right to attend this event." In other words, Price *affirmed* SJP's prerogative to provide Jewish students with the following choice: demonstrably reject a core aspect of their religious, racial, and national origin identities (Zionism) or be banned from accessing an event on campus on the basis of those identities. While this alone is problematic, SJP took things a step further by *assuming*, without asking, that all Jewish students or students with Jewish sounding last names were "ideologically" misaligned absent prior evidence of disavowing Zionism.

35.     Schechter pointed out to Price that Colby Abeles is not even Jewish, and like the other students he mentioned, had zero involvement in pro-Israel activities on campus. SJP had no reasonable basis to conclude any of these individuals, with perhaps the exception of Schechter, had opinions one way or the other about Israel. The only basis upon which SJP could have made this determination is the fact that they had Jewish sounding last names or were otherwise known or assumed to be Jewish. SJP banned Jewish students solely on grounds of their Jewish sounding last names absent prior evidence they rejected a core aspect of their religious, racial, and national identity, a guilty until proven innocent policy applied to no other minority group. Price responded by noting that he refused to "debate" Schechter.

36.     That evening, Schechter and Tako attempted to attend the SJP event and were greeted at the entrance by Chapman security and Dean Price. Price, backed by Chapman security officers, actively barred Schechter and Tako from entering. Schechter and Tako were instructed to leave and were followed out by a member of SJP.

37.    On November 12, 2024, Khader posted on Instagram "May allah bring death to all Israelis who follow Zionism." Malka sent Khader a direct message asking "so you want me dead?" Khader responded ". . . Fuck yeah I want you and all you zionist trash bags dead the fuck kinda question is that." He then sent Malka a barrage of texts including "Also stop being a little girl trying to set me up and run over to Mr. Price" and "Zionism is terrorism, you are the Terrorist polluting this world with your fucking lies." Malka reported this death threat to Price and Struppa, noting "I hope you all understand the threat and danger he holds. I really don't feel safe on campus. The Jewish community does not feel safe on campus. Please hold him accountable. I believe this crosses every single one of Chapman's DEI, student conduct, and community morals and guidelines. I don't want to have to keep saying I am scared until it is too late and dangerous students like him take more violent action. I attached some photos to further validate his threat and my concern." Malka attached photos showing Khader handling firearms.

38.    Struppa wrote to his colleagues "I think this kid has crossed the line. 'Bitch I want you dead' is directed to her personally and it seems to me not protected speech. And the weapons?"

39.    Khader, however, was never disciplined and/or otherwise not disciplined to the extent others have ordinarily been disciplined by Chapman for far less than identity-based death threats.

40.    For example in 2020, Chapman expelled a student who went on a racist and homophobic rant but did not issue any death threats and for whom there was no indication of immediate firearm access. While that student damaged property (like Khader) and assaulted a school security guard, the university made clear its grounds for disciplinary action lied in the students anti-black racism and homophobia, with President Struppa noting: "Racist and homophobic conduct will not be tolerated on this campus and we took decisive and swift action. As of this afternoon, the individual responsible for this incident is no

longer a student at Chapman University."[12] Further clarifying that Chapman's primary grievance centered on racism and homophobia, Struppa also noted: "A disruption took place in a Chapman classroom that included racist and homophobic statements, along with inappropriate and disrespectful behavior . . . I want to extend my deepest apologies to the Black and LGBTQIA communities who were specifically targeted during today's incident . . . February is a celebration of Black History Month. During a time used to honor the generations of African Americans who have struggled and sacrificed, I am disgusted that an incident like this took place on our campus. We must be better than this." Needless to say, the University never issued similarly worded statements about Khader.

41.    In comparison to the 2020 expulsion based on a *single* incident of severe racism and homophobia, Chapman literally gave Khader a free lunch instead of meaningful discipline despite *multiple* incidents of antisemitic racism, including destruction of property and vandalism.

42.    Plaintiffs anticipate that discovery will show an abundance of additional instances in which groups other than Jews were targeted and the responsible students were disciplined far more harshly for far less than what Khader or SJP more generally did.

43.    Chapman conducted a brief "threat assessment" on Khader and determined him not to be a threat. Malka pushed back in a November 16, 2024 email noting: "Its apparent Ismael's behavior is becoming increasingly dangerous and volatile. How many Jewish students does Ismael have to threaten? What if next time it isn't a threat, it's an action . . . I am scared for my life because of being a student. I don't want to be the next Jew to be attacked or murdered. You have all been warned and made well aware of many incidents involving him, what more do you need? For me to be shot dead and it being too late?" Malka concluded her email by suggesting absent meaningful action to protect her and fellow Jewish

---

[12] https://jbhe.com/2020/02/chapman-university-student-utters-racist-tirade-in-university-classroom/;
https://x.com/ChapmanU/status/1225520724737175562

students, it might be best to pursue her matter with the U.S. Department of Education's Office for Civil Rights ("OCR"). Chapman took no meaningful action.

44.    Malka experienced emotional distress so great from Khader's death threat and Chapman's corresponding refusal to remove him from campus that her eyes often swelled shut to the point where it obstructed her vision to such a degree it was unsafe for her to drive and she needed to walk to school.

45.    For the remainder of the fall semester into the spring semester, Schechter remained in constant contact with Price, regularly apprising him of SJP's targeting of Jewish student organizations and the close link between Jewish identity and Zionism.

46.    On February 12, 2024, Schechter and Malka filed a formal complaint with OCR on the basis of Chapman's lack adequate action regarding Khader's death threat to Malka and Chapman's endorsement of SJP excluding Jewish students on nothing more than their Jewish-sound last names. The OCR Complaint provided Chapman with copious, expert analysis on the link between Zionism and Judaism as applied to Plaintiffs, which supplemented the frequent explanations Schechter provided Chapman in layman's terms.

47.    On April 12, 2024, Schechter again raised issue with SJP's targeted campaign of ripping down flyers posted by Jewish student groups and replacing them with anti-Israel flyers. Schechter noted: "I'm noticing a degradation in Chapman's rule of law. The Jewish community is overwhelmingly rule followers. Chapman's ongoing lack of response (in actions and messaging) creates a perception that violating the student code of conduct is acceptable." Schechter went on to detail SJP's targeted campaign and noted "Unsurprisingly, SJP flyers now replace the precious real estate where SSI flyers were. Under Chapman student code of conduct (which I follow firmly), we will never be able to reclaim that space in the piazza." Schechter further advised Price that "The perception I'm noticing is that Jewish freshman regret enrolling here, prospective Jewish students are fearful to enroll here, current Jewish students say

they wouldn't have ever enrolled here if this was happening while they were touring schools and the Chapman community in general is deeply unhappy. Would you be willing to adjust policies or put out a message? I think the campus would benefit from a deterrence or at least a perceived deterrence from violating Chapman's Student Code of conduct."

48.    On April 12, 2024, Schechter sent Price another email noting "I'm seriously being targeted. This is intimidation and bullying. What campus resources are available to me?" Schechter later clarified that he was being targeted by SJP leader Duran Aziz with unwanted homosexual innuendo such as telling Eli he loved him while making a "kissy face." Aziz also put an intimidating shout-out to Eli and SSI in his Instagram bio. Plaintiffs' never saw Aziz engaged in acts of homosexual intimidation directed at non-Jewish students.

49.    On April 18, 2024, Schechter was approached by SJP faculty advisor Lisa Leitz, on the instruction of SJP members she was with, as Schechter was posting pro-Israel flyers in accordance with university policy on flyering. Schechter was wearing a shirt that said "AEPi stands with Israel" and a well-known necklace supporting the Israeli hostages. Acting on SJP's request to intervene, she screamed at Schechter that he was in trouble, did not have authorization to post the flyers, and that she would be calling campus Public Safety on him. Schechter was with two students, one of whom captured some of Leitz's tirade on video. Schechter informed Price of this incident shortly after it occurred. Chapman did not discipline Leitz despite acknowledging she broke understood university protocol by directly confronting Schechter. The university took no meaningful umbrage with Leitz, a university professor, acting at the behest of a campus antisemitic hate group. By enlisting a professor to deny Jewish students a voice on campus, SJP sought to enhance its general policy of racial harassment and intimidation against Jewish students.

50.    On April 18, 2024, Schechter told Price "Again, SJP is taking away our freedom of speech. While their flyers are up everywhere, AGAIN, the flyers we put this morning are already gone. I believe they

were taken down in mass between 4:15 and 5:15 pm today. I know it's coming from SJP because the flyers that were still up were covered by a new SJP flyer reading 'misinformation, QR code sends money to IDF.'" He pleaded with Price, noting "Dean Price please give me some relief from this nonstop attack on our ability to have free speech. As a Chapman patriot, I want rule of law and peace which go hand in hand. After today, I'm hoping for a deterrent from the antisemitic students violating Chapman student code of conduct which has overwhelmingly targeted our community of ethnic Zionists." Schechter further informed Price that "students across Chapman complained about the excessive noise, megaphone usage and parading with the megaphone across campus. [SJP and affiliated organizations] used these devices to blast antisemitic statements." <u>Such statements included calls for Intifada, or the lynching of Jews.</u>[13] These calls for the lynching of Jews permeated the campus. Schechter presented Price with the following text message he received from a fellow student: "I was in my professor's office taking a quiz and you could hear them fully yelling into their megaphones and he seemed very annoyed with it. If you can hear it through Beckman 4th floor it has to be distracting students and professors." Given the calls for violence against Jews ubiquitous in these chants, such chanting was far more than distracting and harassed the entire Jewish student body. These processions persisted for the remainder of the school year.

51.    On April 23, 2024, Schechter again reported to Price SJP's campaign of ripping down pro-Israel flyers and replacing them with anti-Israel flyers. Tammy South of Public Safety indicated that video appeared to show an older male, presumably not a student, ripping down the flyers. Schechter pointed out the absurdity of believing SJP telepathically knew when and where unaffiliated individuals were ripping down flyers so its members could swoop in and fill the space with anti-Israel flyers, including those calling for Intifada. He further advised them of a flyer saying "there is only one solution, intifada

---

[13] *See, e.g.*, https://www.adl.org/resources/backgrounder/slogan-globalize-intifada; https://www.ajc.org/news/what-does-globalize-the-intifada-mean-and-how-can-it-lead-to-targeting-jews-with-violence

revolution." The use of the term "solution" is, of course, an allusion to Adolf Hitler's final solution, and Palestinian Intifada is responsible for more Jewish deaths post-Holocaust than any other organized campaign of violence against Jews.

52.    Schechter sent another email to Price on April 23, 2024, similarly noting "NEARLY ALL OF THE 100+ FLYERS PUT UP ACROSS CAMPUS WERE TORN DOWN AND REPLACED WITH SJP FLYERS." Schechter went on to note "I request IMMEDIATELY these flyers are taken down and that SSI is given its place to have a voice (by putting our flyers up in the same location). I request IMMEDIATE consequences so that we can have some relief from being targeted by this antisemitic group." Schechter essentially clarified that tearing down of pro-Israel flyers and replacement with anti-Israel flyers, sponsored by SJP, was a one-two combination and not two unrelated events. Schechter also explained that due to Chapman's refusal to appropriately discipline SJP, pro-Israel student groups were being given unequal access to campus space for the purpose of flyering. Whenever they posted their flyers, SJP tore them down almost instantly, without consequence, and replaced them with anti-Israel flyers. SJP only did this to flyers posted by Jewish groups. Therefore, when Price suggested pitching posting volume limits applied to both SJP and SSI, Schechter pointed out the obvious that this plan was meaningless if SJP would continue to rip down SSI flyers. Schechter indicated discipline against SJP was a more appropriate measure.

53.    On April 24, 2024, Schechter accurately reported to Price and other administrators, including President Daniele Struppa, that SJP leader Aziz gestured a Nazi salute to Schechter and another Jewish student. This is the same individual who attempted to intimidate Schechter with homosexual innuendo. Aziz was not disciplined. Aziz's Nazi salute occurred in the midst of an SJP-organized procession in which participants chanted for Intifada and held signs, written in blood red, reading "there is only one solution Intifada Revolution." Schechter retains video of Aziz's Nazi salute and photos of individuals

holding the Intifada signs. Schechter also documented chalking saying "globalize the Intifada," aka "globalize the lynching of Jews."

54.    On April 25, 2024, Schechter reported to Price and Struppa that SJP organized marchers on campus were regularly chanting "globalize the Intifada" and chalking the same on campus sidewalks. At no point did Chapman sanction SJP or discipline any members for these slogans. These chants were amplified with the use of megaphones, and while Schechter requested Price to prohibit their use, he refused.

55.    On April 30, 2024, and despite being given clear notice and evidence by Schechter that SJP was calling for the lynching of Jews in its rallies (Intifada), Price wrote a campus wide email noting "as with their <u>last demonstration</u>, SJP leaders are complying with applicable University policies." In other words, Chapman's "university policies" permitted rallies calling for the lynching of Jews. Otherwise, the rally referenced above would have been non-compliant with university policy. It was also made clear that Chapman did issue statements when it felt like it, i.e. to defend SJP, but not to defend the Jews when they were begging for help. Moreover, as noted, in 2020 Chapman released a lengthy statement following a single instance hateful rhetoric that nonetheless lacked any calls for racialized violence such as Intifada. When a student used slurs against blacks and gays, Chapman publicly condemned it. When a student group called for Jews to be lynched, Chapman shockingly held this complied with university policy.

56.    On May 1, 2024, Schechter provided Price with photographs of individuals ripping down pro-Israel flyers. He also identified SJP President Yasmine Azmi as an accomplice of an individual who ripped down flyers. Upon information and belief, Chapman never disciplined Azmi. In a separate email on that day, Schechter wrote to Price: "I'm not trying to give you a hard time but when I and others clicked to open [your] email, we expected to read 'Globalize The Intifada was on our campus, it might be on our campus again Wednesday. It means to globalize killing the Jews and we unilaterally condemn

that antisemitism.' It almost begs the question of what actions need to occur before you would condemn it." Schechter was referring to the SJP organized rallies chanting for Intifada. Schechter concluded with "I respectfully ask that you specifically mention antisemitism and the Jewish community. After SJP's Wednesday protest, if there is again antisemitic chalk, chants and actions, I urge you to send a condemnation email." Price never sent an email condemning an officially sanctioned student group's regular calls for the lynching of Jews.

57.    On May 1, 2024, Malka also documented chalking saying "viva viva Intifada."

58.    On or about May 2, 2024, SJP and affiliated organizations set up an antisemitic encampment functionally identical to those seen around the country, and established a set of rules, including that admission to the university property it occupied be granted only to those who are "anti-Israel." As noted, supporting Israel is a religious imperative for Plaintiffs and Jews more generally and similarly reflective of their intertwined racial and national origin identities. Shortly after the encampment was established on May 2, Schechter and a friend entered it while wearing an AEPi shirt, a well-known Jewish fraternity, and he was escorted off its premises by SJP-appointed encampment enforcers. Students participating in the encampment advised Schechter and his friend that Zionists were not permitted inside. Leaked SJP group texts reveal encampment participants later conspiring to ensure Schechter did not enter the encampment due to his well-known Zionism. Schechter apprised Price of this incident and the group texts shortly thereafter.

59.    On May 3, Price emailed the Chapman community acknowledging the encampment. No one in Chapman's administration took any meaningful steps to remove the encampment, despite its widely publicized policy banning the vast majority of Jews from a portion of campus. In fact, Price shockingly acknowledged in his email "[t]he students taking part in the protest have developed a registration procedure to ensure that everyone in the encampment is approved to be there." Price of course failed to

acknowledge the written rule at the entrance banning those who support Israel. Price was aware of this rule not only because of his daily communications with Schechter but because Price made multiple daily trips to the encampment, including weekend visits, and he literally mentioned the very "registration procedure" that prohibited the vast majority of Jewish students from entering the portion of campus overtaken by the encampment. To be perfectly clear, Chapman officially approved of a campus encampment that openly barred the majority of Jewish students on the basis of a sincerely held religious belief and characteristic of their race and national origin.

60.    On May 3, 2024, Malka discovered a dead squirrel and brick outside her house, the squirrel having been repeatedly smashed with the brick by appearances. At this time, it was widely known on Campus that Schechter and Malka had initiated proceedings against Chapman at the Department of Education and were demanding the university ban SJP.

61.    On May 6, 2024, Schechter documented signage at the encampment saying "from the river to the sea," a common slogan calling for wiping Israel off the map and replacing it with a Palestinian dominated state.

62.    On May 7, 2024, Schechter wrote to Price, Struppa, and other Chapman officials: "What would happen if I exercised my right to put up SSI flyers in that area or a student with a kippah or Jewish star necklace tried entering that section of campus? These two activities, which were previously everyday occurrences, are forbidden by the SJP camp and will be forcibly stopped by their independent 'security' bullies. They have security to ensure their rules have effect and can be physically forced if needed . . . As their camp increases in size, the more territory on campus they can enforce their rules and the more power they believe they have at the negotiating table." Schechter accurately described an expanding antisemitic takeover of portions of Chapman's campus that enforced a policy banning Jews on the basis of Zionism, a sincerely held Jewish religious belief for Plaintiffs and inseparable from the race and national origin.

Schechter further apprised the administrators of group text leaks he had secured in which SJP and affiliated organizations conspired to disrupt pro-Israel student groups' events. He reiterated that the SJP-led encampment banned "an ethnic minority they hate . . . from their encampment."

63.    On May 8, 2024, Schechter reported to Chapman public safety officials the vandalization of a Jewish student group's Holocaust memorial. He also raised concerns about how Chapman had let the encampment completely take over its occupied portion of campus as evidenced by the fact that Chapman was doing nothing as encampment participants used illegal drugs out in the open.

64.    The inadequacy of Chapman's response to SJP's antisemitic harassment and discrimination is evidenced by continuations of the above in the following school year. For example, students discovered chalking saying "fuck Israel" above a chalked picture of a burning Israeli flag on September 19, 2024. As noted, the Israeli flag represents the Jewish people and heritage. On October 7, 2024, an SSI chalking that said "bring them home - SSI" was defaced with an inverted red triangle above the message. Importantly, at all times relevant hereto, SSI is a recognized DEI club rather than a political organization.

65.    Inverted Red triangles stand for targeting Jews for murder, as first popularly adopted by Hamas for use in the Gaza Conflict.[14] Courts in this district have acknowledged this characterization of red triangles must be accepted as true for pleading purposes. *See StandWithUs Center for Legal Justice* v. *CodePink et al*, 2:24-cv-06253, (C.D. Cal.) ECF No. 131 at 19-22.

66.    Students discovered similar chalking on October 8, 2024 as well as with "long live the Intifada" and "death to Israel" written above a chalked Israeli flag. Plaintiffs retain photographs and videos of all of these chalkings. Chapman so utterly failed to address the antisemitic hostile education environment it allowed to fester in the 2023-2024 school year, and indeed, on multiple occasions actively participated in it, that it instantly reemerged at the start of the 2024-2025 school year.

---

[14] https://www.jewishvirtuallibrary.org/the-inverted-red-triangle-a-symbol-of-hate

67.    On or about January 21, 2025, Chapman, acting through its Office of Diversity, Equity, and Inclusion, presented an award to SJP in honor of Dr. Martin Luther King Junior. Following immediate backlash from various actors including the Anti-Defamation League, the nation's oldest non-partisan antisemitism watchdog, President Struppa issued a statement criticizing the decision and noting in relevant part: "actions taken by SJP over the last several months are largely incompatible with the spirit of Dr. King's approach." Critically, Struppa also noted "[c]ustomarily, I would not opine on the judgment of a university office or its process, but I'm afraid that these particular circumstances prompt me to take the highly unusual step of offering public criticism." In other words, even the highest levels of Chapman's administration ultimately recognized SJP's conduct described herein was so egregious that it required the Office of the President to take "the highly unusual step of offering public criticism" when the public got word of the university's endorsement. Finally, Struppa closed his letter by noting "I wish to offer to all those offended by this action and, in particular, our Jewish students and their families my sincere apology on behalf of the university." Struppa's closing sentence is important because it clarifies that even Chapman seemed to ultimately recognize that SJP's conduct was not merely raucous opposition to a foreign state but rather squarely directed at the Jewish people.

68.    As previously noted, Struppa also took a strong stance when Khader issued a death threat to Malka, indicating his and other administrators' awareness that SJP and its members were "cross[ing] the line" was longstanding. Only discovery can show why exactly this recognition never translated into action that confronted SJP's harassment and exclusion of Jewish students. On information and belief, Chapman's Office of DEI played a role in putting the breaks on ameliorative actions and did not merely passively sympathize with a group calling for race-based lynchings but blocked their discipline and making Chapman safer for Jewish students.

69.     Finally, removing any doubt that that SJP understood it was targeting Israel as a proxy for Judaism and not as a political entity, on May 1, 2025 it chalked an inverted red triangle with the words "fuck Israel" directly in front of where Chabad, a wholly religious and apolitical orthodox Jewish organization, was tabling. It similarly chalked a Palestinian flag as an act of ethnic intimidation in front of where the apolitical Jewish AEPi fraternity was tabling. Next to the Palestinian flag SJP wrote "SJPC," which stands for SJP Chapman.

70.     To date, SJP has not rescinded its policy of disallowing Zionists from its programming and spaces and Chapman has not required such a change.

**Contextualizing SJP's Apolitical, Ethno-Religious Campaign against Jewish Students**

71.     On October 11, 2023, Chapman SJP issued a statement noting "Gaza is the cradle of the *resistance* and the lifeblood of our struggle for national liberation. *We echo the call to action* for all people to rise up and support the liberation of our occupied people. From the River to the sea, we will continue until we see a liberated Palestine." (emphasis added).[15]

72.     As noted by the non-partisan Anti-Defamation League, "resistance" is "a euphemistic reference to the various terrorist groups responsible for violent attacks against Israel."[16]

73.     Four days prior to SJP's statement, the "resistance" rose up and slaughtered 1,200 people in Israel. There were no other contemporaneous  acts of "resistance" from Gaza other than the Hamas attacks that began on October 7. SJP viewed the worst massacre of Jews since the Holocaust as the inciting "call to action" to begin its campaign of harassment and discrimination against Jewish students.

74.     Expert testimony, historical treatises, public documents, and/or judicially noticeable material will establish that the Israeli-Palestinian Conflict as pursued by Hamas and its sympathizers like SJP is largely

---

[15] https://www.instagram.com/p/CySIMrprJiT/?hl=en&img_index=4

[16] https://www.adl.org/resources/article/fight-until-victory-speakers-guests-declare-full-support-terrorism-peoples

an ethno-religious war against Jewish immigrants and their descendants rather than a political conflict. Answering a "call to action" by Hamas therefore cannot properly be described as "political," and the same goes for threatening acts of violence against Jews such as by calling for Intifada (lynching) and utilizing inverted red triangles.  Since Day One of the Jewish people's mass return to their indigenous homeland in the late 1800s, violent opposition to Israel and its people has been deeply linked to antisemitism, and SJP's affirmative response to Hamas's call to action must be understood in this light.

75.    At the time Jews began returning via immigration to Israel in the late 19th century, many non-Jewish Arabs from neighboring lands also immigrated to what would become Israel. Arab immigrants and their descendants ultimately came to form a meaningful portion of the people who today are called Palestinians. However, the small, indigenous, overwhelmingly Muslim, Arab population took virtually no issue with these fellow Arab immigrants, with extremist factions instead focusing the entirety of their efforts to drive out the Jewish immigrants and their descendants, launching a campaign of terror or "resistance" now well into its second century. As racial-religious considerations determined which immigrants would be welcomed and which would not, the origins of the Israeli-Palestinian are ethno-religious and not political. The conflict was not born out of a dispute over, for example, whether communism or capitalism would govern the land. Rather, it was born out of one group's desire to maintain ethno-religious and racial dominance in the face of widespread immigration by another group.

76.    Islamism, an extremist and antisemitic interpretation of Islam to which Hamas and fellow October 7 terrorist organizations adhere, emerged in the late 1920s as violence against Jewish immigrants in the British Mandate of Palestine escalated.

77.    Crystallizing the basis of opposition to Jewish self-determination in Israel, Haj Amin al-Husseini, the Grand Mufti of Jerusalem and core founder of the anti-Israel movement, gave a 1938 speech entitled "Islam and the Jews," in which he directly linked events in the British Mandate to ancient and purportedly

negative history between Jews and Muslims. Al-Husseini understood the conflict in ethno-religious terms and not mere politics. Jews were inherently an enemy of Islam (and therefore the overwhelming majority of Palestinians) rather than a group of people with different ideas on determining how a state's resources are distributed (politics).

78.    During his exile in Nazi Germany, al-Husseini cemented what would become a narrative encapsulated in the Hamas Charter. For example, in 1944, al-Husseini gave a broadcast urging followers to "kill the Jews where you find them. This pleases God, history and religion." Years later, Hamas adopted a version of this plea into its charter, again clarifying that opposition to Israel's existence and support of Intifada is ethno-religious rather than political.

79.    In 1987, the al-Husseini influenced Muslim Brotherhood established its Palestinian branch, better known as Hamas, in 1987.

80.    After a twenty year campaign of varying degrees of antisemitic terrorism, Hamas won the 2006 Palestinian legislative elections, took over Gaza in 2007, and perpetuated the October 7 Massacre in 2023.

81.    In summary, answering a call to action by Hamas is not political but deeply rooted in well over a century of antisemitism and violent opposition to Jews re-immigrating to their indigenous homeland.

## **Class Allegations**

82.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Plaintiff Classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

Class Definition

83.    The class is all Jewish students at Chapman University for the 2023-2024 school year through the present school year, which for now includes the 2024-2025 and 2025-2026 school years. There is a well-defined community of interest in the litigation, and the class is readily ascertainable. SJP's targeted attacks described herein were directed at Jews in general, such as the routine calls for Intifada, irrespective of a particular Jewish person's views on Israel. As we saw on October 7, Intifada does not discriminate on the basis of Zionism; the October 7 Intifada killed Zionist and non-Zionists Jews alike. Moreover, all Jewish students were discriminated against because, at least for the 2023-2024 school year, they were subject to a litmus test whereby their attendance at SJP programming was blocked on grounds of having a Jewish sounding last name or being known as Jewish absent evidence that they had disavowed a core feature of their Jewish identities. A similar litmus test applied to the SJP-ran encampment and was used as a basis to deny Jewish students access to a portion of campus. SJP did not subject any other group to litmus tests whereby members were required to make similar disavowals. With Chapman's full support, SJP otherwise continues to ban Zionists from programming to this day, including Jewish students for whom Zionism a core feature of their Jewish identity and a sincerely held religious belief. SJP's discrimination and harassment stigmatized the entire Jewish community at Chapman. At all times relevant hereto, Chapman was aware of this harassment and discrimination and permitted it.

84.    There are two sub-classes. Sub Class 1 is all Jewish students for the 2023-2024 and 2024-2025 school years who were subjected both to SJP's antisemitic harassment and discriminatory exclusion of Jews from campus spaces and programming. Sub Class 2 is all Jewish students for the 2025-2026 school year subjected to SJP's ongoing discriminatory exclusion on the basis of its "no Zionists" policy.

Numerosity

85.    Chapman's student population for the 2023-2024 school year was 10,001 and Jews made up about 10% of the total student population. Given two more school years and therefore the addition of around 250 new Jewish students each year, with a presumed equal number matriculating and graduating, the class size is around 1,500. Although the exact number of prospective class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of prospective class members' claims in a single action will provide substantial benefits to all parties and to the Court. The prospective class members are readily identifiable from information and records in Defendant's possession, custody, or control, including but not limited to actual records identifying them as Jewish but also contact information for the entire student population, allowing routine opt-in/opt-out communications to be sent.

Typicality

86.    The claims of the representative Plaintiffs are typical of the claims of all prospective class (and alternative class) members in that the representative Plaintiffs and the prospective class members were Jewish students at Chapman for the 2023-2024 school year through the present school year who, with knowledge and acquiescence of Chapman (1) experienced SJP-led antisemitic harassment including but not limited to routinely hearing calls for Intifada that targeted Jews indiscriminately, and/or (2) were subjected to and stigmatized by SJP's antisemitic litmus test requiring Jews to disavow a core aspect of Jewish identity in order to enter SJP events or campus property SJP commandeered. The representative Plaintiffs, like all prospective class members, have been damaged by Defendant's misconduct in that their educations were significantly disrupted, and they otherwise were in contractual privity with Chapman but did not receive the full benefits of their contracts due to the harassment and discrimination Chapman permitted. Furthermore, the factual bases of Chapman's misconduct are common to all

prospective class members and represent a common thread resulting in injury to all prospective class members. This analysis applies equally to the alternative class.

Commonality

87.    There are numerous questions of law and fact common to Plaintiffs and the prospective class members that predominate over any question affecting individual prospective class members (and alternative class members). These common legal and factual issues include the following:

-    Whether SJP and affiliated groups, with Chapman's knowledge and acquiescence, harassed Chapman's Jewish student population by routinely calling for Intifada and engaging in other acts including by not limited to a systemic campaign of destroying flyers posted by Jewish student groups;

-    Whether SJP and affiliated groups, with Chapman's knowledge and acquiescence, discriminated against Jewish students by subjecting them to a litmus test whereby they could not attend SJP events or enter SJP commandeered spaces unless SJP knew they had disavowed a core aspect of Jewish identity;

-    Whether SJP's conduct is attributable to Chapman or Chapman is otherwise liable for failing to prevent SJP's discriminatory and harassing conduct;

-    Whether Chapman's knowledge and acquiescence of SJP's above-described harassment and discrimination sounds in Title VI of the Civil Rights Act of 1964;

-    Whether Chapman's knowledge and acquiescence of SJP's above-described harassment and discrimination sounds in the Civil Rights Act of 1866;

-    Whether Chapman's knowledge and acquiescence of SJP's above-described harassment and discrimination sounds in Cal. Educ. Code § 220.

<u>Adequate Representation</u>

88.     Plaintiffs will fairly and adequately protect prospective class members' interests. Schechter was the lead voice on campus conveying the interests of Jewish students to Chapman's administration during the 2023-2024 school year and Malka worked in close coordination with Schechter. Both Plaintiffs were the named complainants in a complaint filed against Chapman with OCR, and there were no other student complainants. Plaintiffs intend to prosecute this action vigorously and have a track record of pursuing the interests of Chapman's Jewish students since Day 1 of the Post-October 7 world. Plaintiffs have retained attorneys experienced in prosecuting class actions, including discrimination class actions, and have had an attorney-client relationship with Attorney Mainen since November of 2023. Class Counsel are the undersigned attorneys, who are expert in antisemitism law, a highly specialized field permeating this entire case. This analysis applies equally to the alternative class.

<u>Predominance and Superiority</u>

89.     Plaintiffs and the class members have all suffered damages as a result of Chapman's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. There are also simply not enough lawyers who specialize in antisemitism law, an extremely specialized field, to individually bring claims on behalf of upwards of 1,500 Jewish students. Absent a class action, class members will continue to remain uncompensated for damages and Chapman will continue to permit harassment and discrimination of Jewish students, as was made clear at the very start of the school year following that giving rise to the claims at issue here. Class treatment of common questions of law and

fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will preserve judicial economy in comparison to 1,500 individual lawsuits.

90.    In the alternative, the class may be certified because:

-    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendant. For example, it is entirely possible one judge will rule that targeting Jews on the basis of their affiliation to Israel is unlawful discrimination while another may rule to the contrary;

-    the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests, especially when considering the likelihood Chapman could invoke estoppel doctrines; and

-    Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the members of the class as a whole, and the statutory basis of this suit permits such equitable relief. Injunctive relief is particularly important for those who are still students at Chapman and are at risk of continued discrimination and harassment by SJP. This also applies to alumni who would like to visit the campus free from the same.

# CAUSES OF ACTION
## <u>Count I</u>
## 42 U.S.C. § 2000d et. seq.
## Title VI of the Civil Rights Act of 1964

91.     Plaintiffs incorporate all above paragraphs as if stated fully herein.

92.     Title VI provides that "[n]o person in the United States shall, on the ground of race . . . or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

93.     Chapman receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

94.     For purposes of federal anti-discrimination law, Jews are both a race and national origin group. *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-618 (1987) (race); *Sinai v. New Eng. Tel. & Tel. Co*., 3 F.3d 471, 474 (1st Cir. 1993) (national origin); *see also* 34 C.F.R. § 100.3. Race also includes "ancestry or ethnic characteristics," *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

95.     Jewish identity is multifaceted and overlapping. A characteristic of such may at once be a sincerely held Jewish religious belief, a core component of Jewish racial identity, and a signifier of Jewish national origin. This is especially true for the Zionist component of Jewish identity and overall support of Israel. *See Sumrall v. Ali*, No. 1:25-cv-2277 (TNM), 2025 U.S. Dist. LEXIS 149422, at *19 (D.D.C. Aug. 4, 2025) ("Purposefully yanking on an Israeli flag tied around a Jewish person's neck to choke them is direct evidence of racial discrimination").

96.      Defendants excluded Plaintiffs from participation in Chapman programs, denied Plaintiffs the full benefits of Chapman programs, and subjected Plaintiffs to discrimination, all in violation of Title VI. As detailed at length above, Chapman, acting through and/or in full cooperation with and/or acquiescence to SJP excluded Jewish students from events and physical spaces on campus solely in virtue of their

Zionism, a core aspect of Jewish identities. Chapman and SJP further discriminated against all Jewish students irrespective of their Zionism by subjecting Jews and only Jews to a litmus test requiring them to disavow a core aspect of their racial and national origin identities. With respect to the SJP teach-in, merely having a Jewish sounding last name was enough to instigate SJP's discrimination. Chapman also sustained a hostile education environment through SJP's unrelenting harassment of Jewish students ranging from targeted campaigns to remove and replace flyers of Jewish student organizations (and only their flyers) to routine calls for the lynching of Jews (Intifada).

97.    As a result of Chapman' actions, Plaintiffs were injured by losing access to: educational opportunities, equal participation in the life of the university, and even physical spaces on campus solely due to their Jewish identities. The stress induced by the harassment also adversely impacted their ability to learn and perform on exams, leading to diminished performance in or enjoyment of educational opportunities. The discrimination and harassment also forced Jewish students, not least of which class representatives, to divert time and attention away from academics and campus life to combatting the on-campus antisemitism that Chapman endorsed.

98.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, pre-judgment and post-judgment interest, equitable relief, costs, and attorneys' fees.

## Count II
### 42 U.S.C. § 1981
### Title VI of the Civil Rights Act of 1964

99.    Plaintiffs incorporate all above paragraphs as if stated fully herein.

100.    42 U.S.C. § 1981(a) reads: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."

101.    42 U.S.C. § 1981(b) reads: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

102.    The Supreme Court has recognized that § 1981 reaches racial harassment, noting "racial harassment violates §1981 . . . because the right to 'make and enforce' a contract includes the manner in which the contract is carried out." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 344 (2020). In a typical § 1981 harassment case, usually in the employment context, both the harasser and plaintiff are in contractual privity with the defendant but not each other and courts hold the defendant nonetheless has an obligation to prevent the harassment. *See, e.g., Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690 (9th Cir. 2017) (reversing summary judgment for employer-defendant in § 1981 co-worker harassment case). Similarly, §1981 prohibits a party from disparately treating, on grounds of race, those with whom it is in contractual privity in comparison to others with whom it is in privity under a similar contract. *See Id.* at 690-693 (discussing and applying a disparate treatment analysis under §1981). Nothing in the plain text of §1981(b) or the entirety of the statute limits the prohibition on racial harassment or discrimination to the employment context.

103.    Plaintiffs and Chapman were in contractual privity whereby in exchange for Plaintiffs' tuition and other consideration, Chapman was bound to provide an education and educational experience to Plaintiffs, including equal access to campus spaces and organizations without regard to race, and under §1981 Chapman had an obligation to ensure that others with whom it was in similar contractual privity did not racially harass Plaintiffs. It had a similar obligation to not racially discriminate against Plaintiffs or permit others to discriminate against Plaintiffs such that Plaintiffs were deprived of the benefits of their contract in a way those belonging to other races were not.

104.    Chapman, however, did not afford Plaintiffs equal "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," and therefore deprived them of their right to contract under this statute.

105.    Specifically, Chapman through SJP, sustained an atmosphere of racial harassment and discrimination that deprived Plaintiffs of their bargained-for education and educational experience and this deprivation is traceable to Plaintiffs' Jewish race. Plaintiffs were deprived the right to attend events hosted by SJP or access space commandeered by SJP because of their Jewish race. They were otherwise unable to enjoy and benefit from their educational experience like other students due to the endless barrage of racial harassment foisted upon them, including but not limited to calls for the lynching and murder of their people.

106.    §1981 was passed under the 13th Amendment to aid in eliminating all "badges and the incidents of slavery." *Jones v. Alfred H. Mayer Co.* 392 U.S. 409, 440-41 (1968). It goes without saying that racially motivated lynchings and calls for such are a quintessential badge of slavery. As noted, Jews are considered a race for purposes of anti-discrimination law, including §1981. *Shaare Tefila*, 481 U.S. at 617-618. §1981 therefore reaches not only the disparate treatment of Jewish students at Chapman but the racial harassment they experienced.

107.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, pre-judgment and post-judgment interest, equitable relief, costs, and attorneys' fees.

## COUNT III
### Cal. Educ. Code § 220
### Prohibition of Discrimination

108.    Plaintiffs incorporate all above paragraphs as if stated fully herein.

109.    Section 220 of the California Education Code reads, in relevant part: "No person shall be subjected to discrimination on the basis of . . . race[,] ethnicity, [or] religion . . . in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid."

110.    Chapman receives state financial assistance and enrolls pupils who receive state student financial aid.

111.    Defendants subjected Plaintiffs to discrimination on the basis of their Jewish race, ethnicity, and religion as described in detail above.

112.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, pre-judgment and post-judgment interest, equitable relief, costs, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.    That the Court order Defendants to pay compensatory damages;

B.    That the Court order Defendants to pay punitive damages;

C.    That the Court enter judgment in favor of Plaintiffs including injunctive relief requiring Defendants to not permit discrimination and harassment of Jewish students;

D.    That the Court order Defendants to pay Plaintiffs' reasonable attorney's fees, expert fees, and costs; and

E.      That the Court order Defendants to pay pre-judgment and post-judgment interest as provided by law.

## **JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all claims against Defendants.

Date: January 20, 2026                    Respectfully submitted,


**NATIONAL JEWISH ADVOCACY CENTER, INC.**

  */s/ Matthew Mainen*
*Practicing Pro Hac Vice*
   */s/ Mark Goldfeder*
*Practicing Pro Hac Vice*

**CARTER ARNETT PLLC**
   */s/ Omer Salik*

**In Every Generation**
A division of Hershenson Rosenberg-Wohl, APC

  */s/ David M. Rosenberg-Wohl*


## **CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2026 the foregoing was served on all counsel of record electronically via the Court's CM/ECF e-filing system and/or e-mail.


*/s/ Matthew Mainen*